1  COAST LAW GROUP, LLP
   MARCO A. GONZALEZ (SBN 190832)
2  LIVIA BORAK BEAUDIN (SBN 259434)
   NATALIE MARCIN (SBN 351072)
3  1140 South Coast Highway 101
   Encinitas, CA 92024
4  Ph: (760) 942-8505
   Fx: (760) 942-8515
5  Email: marco@coastlawgroup.com

6  SAN DIEGO COASTKEEPER
   PATRICK MCDONOUGH (SBN 288285)
7  COURTNEY BROWN (SBN 360257)
   8305 Vickers Street, Suite 209
8  San Diego, CA 92111
   Ph: (619) 609-0860
9  Email: patrick@sdcoastkeeper.org

10 Attorneys for Plaintiffs COASTAL ENVIRONMENTAL RIGHTS FOUNDATION
   and SAN DIEGO COASTKEEPER

11

12                    **UNITED STATES DISTRICT COURT**

13                 **SOUTHERN DISTRICT OF CALIFORNIA**

14

15  SAN DIEGO COASTKEEPER, a non-profit      Civil Case No. **'25CV1762 TWR BLM**
    corporation; COASTAL
16  ENVIRONMENTAL RIGHTS                      **COMPLAINT FOR
    FOUNDATION,                               DECLARATORY AND
17                                            INJUNCTIVE RELIEF AND CIVIL
    a non-profit corporation,                 PENALTIES**
18
19               Plaintiffs,                  **(Federal Water Pollution Control Act,
           v.                                  33 U.S.C. § 1251 *et seq*.)**
20
21  PC IRON, INC.; a California Corporation,
22               Defendant.

23

24  / / /
25  / / /
26  / / /
27  / / /
28  / / /

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper ("Coastkeeper") (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.     JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201.

2.     On April 2, 2025, Plaintiffs issued a 60-day notice letter ("Notice Letter") to PC IRON, INC. ("Defendant" or "PCI") as the owner and/or operator of the Facility located at 9038 Jamacha Road, Spring Valley, California 91977  ("Facility"), regarding its violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*), and *Order 2014-0057-DWQ as amended in 2015 and 2018* ("IGP," "Permit," or " Industrial General Permit"). True and correct copies of the Notice Letter and all enclosures are attached hereto as Exhibit 1 and incorporated herein.

3.     Plaintiffs mailed the Notice Letter to the Facility's physical address, 9038 Jamacha Road, Spring Valley, California 91977, and to Defendant's Agent for Service of Process at the same address via certified mail.

4.     Plaintiffs also mailed the Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the San Diego Regional Water Quality Control Board ("Regional Board") as required by 40 C.F.R. § 135.2(a)(1) and 33 U.S.C. § 1365(b)(1)(A).

5.     More than sixty (60) days have passed since the Notice Letter was served on

Defendant and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

6.     Venue is proper in the Southern District of California pursuant to 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

## II.    INTRODUCTION

7.     Plaintiffs seek relief for Defendant's substantive and procedural violations of the IGP and the CWA resulting from its activities at the Facility.

8.     Defendant has discharged and continues to discharge polluted storm water from the Facility to downstream waters and groundwater including Spring Valley Creek, the Sweetwater River, the San Diego Bay, and the Pacific Ocean (collectively "Receiving Waters") in violation of the express terms and conditions of the Clean Water Act, 33 U.S.C. §§ 1301, 1342.

9.     Defendant has also violated and continues to violate the filing, monitoring, reporting, discharge, and management practice requirements, and other procedural and substantive requirements of the IGP. These are ongoing and continuous violations of the CWA and the IGP.

10.     With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial facilities like the Facility flow into storm drain systems, local tributaries, and the Receiving Waters.

11.     Among the Receiving Waters are ecologically sensitive areas providing essential habitat for dozens of fish, hundreds of birds and numerous mammal species, as well as vital macro- and micro-invertebrate species which are an important link in the food web between the producers (leaves, algae) and higher consumers such as fish.

12.     This discharge of polluted storm water and non-storm water from the Facility causes and/or contributes to the impairment of downstream Receiving Waters

and compromises or destroys their Beneficial Uses.

13. Storm water and non-storm water contaminated with sediment, heavy metals, nutrients, and other pollutants harm the special biological significance of the Receiving Waters. Discharges of polluted storm water and non-storm water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment.

14. The polluted discharges from the Facility also harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities, including Plaintiffs' members. The public's, including Coastkeeper's and CERF's members' use of the Receiving Waters for water contact recreation exposes people to toxic metals, carcinogenic chemicals, and other contaminants resulting from storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation and aesthetic enjoyment, are also impaired by polluted discharges, as such discharges cause or contribute to ecosystem and food web degradation. Coastkeeper, CERF, and their members also use and enjoy the Receiving Waters for educational opportunities, developing educational tools, habitat monitoring, restoration activities, and other scientific studies, which are also negatively impacted by the Defendant's IGP and Clean Water Act violations as described herein.

**III.    PARTIES**

15. PC IRON, INC. is an active California Corporation and is the Owner and/or Operator of the Facility.

16. Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office in San Diego, California. Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine sanctuaries, coastal estuaries, wetlands, and bays from illegal dumping, hazardous spills, toxic discharges, and habitat degradation.

17.     CERF is a non-profit public benefit corporation organized under the laws of the State of California with its office located in Encinitas, California. CERF was founded by surfers in North San Diego County and is active throughout California's coastal communities. CERF was established to advocate for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

18.     Many of Plaintiffs' members live and/or recreate in and around the Receiving Waters. Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in scientific studies and restoration efforts, among other activities.

19.     Plaintiffs and Plaintiffs' members have an interest in accurate information about Defendant's discharges. Defendant's failure to accurately report and monitor impedes Plaintiffs' abilities to carry out their missions, and Plaintiffs' members' ability to fully use and enjoy the Receiving Waters for aesthetic, recreational, scientific, educational, and spiritual purposes.

20.     One Coastkeeper member regularly walks, hikes, bikes, and enjoys views and wildlife and native plants in and around the Receiving Water downstream from the Facility. She has engaged in these activities in multiple areas including the network of trails along near the mouth of the Sweetwater River, the San Diego Bay National Wildlife Refuge, the Living Coast Discovery Center, Chula Vista Bayside Park, and the bikeway along the Sweetwater River between San Diego Bay and the Plaza Bonita mall. She began regularly recreating in these areas in about 2018 and currently uses and enjoys these areas almost every week. She participated in the Bike the Bay event each year it has run since 2019. She participated in the biking and running segments of the Chula Vista Triathlon, but did not partake in the swim segment, due in part to her concerns about water quality and pollution in South San Diego Bay. This member is aware of, and concerned about, the many pollutant impairments and pollution burdens in the Sweetwater River and San Diego Bay. She is also aware of the Facility's pollutant

discharges, which contribute to this pollution burden. At times she can smell odors from the waters, and she is concerned about the health of the wildlife, habitat, and ecology in these areas, all of which negatively impact her use and enjoyment. She also avoids contact water recreation such as kayaking due to these same concerns.

21. Another Coastkeeper member regularly collects water quality samples as part of her employment at multiple locations across the region, including at the mouth of the Sweetwater River, directly in front of Pepper Park. She will continue to collect samples at this location every other month during 2025. In her previous employment as a research associate, she spent eight field seasons collecting an annual sediment sample in the Sweetwater River, at the intersection of the river and Willow Street. These samples would be analyzed for toxicity parameters including heavy metals such as those discharged by the Facility. She enjoys viewing the National Wildlife Refuge, and cares about the health of the Refuge and its resident flora and fauna. She is aware of, and concerned about, the many pollutant impairments and pollution burdens in the Sweetwater River and San Diego Bay. In light of her education and experience, she has a deep understanding of the impacts of toxicity pollution, and is highly concerned about the health of the Sweetwater River and National Wildlife Refuge. She is also aware of the Facility's pollutant discharges, which contribute to this pollution burden. She wears personal protective equipment when sampling and avoids contact with this water she knows to be polluted. She would like to engage in contact recreation at the mouth of the Sweetwater River but avoids such activities due to her concerns about pollutant levels.

22. A CERF member lives in Chula Vista and regularly recreates near Sweetwater River. Ms. Ochoa routinely takes her child to Rohr Park, adjacent to Sweetwater River and downstream of the Facility and its discharges. She has a deep appreciation for the birds, fish, and wildlife that depend on Sweetwater River and enjoys watching its resident flora and fauna. This member would like to engage in greater contact recreation in and around Sweetwater River but avoids such activities due to her concerns about pollutant levels. She also discourages her minor child from engaging in

1   such activities because of such concerns.

2       23.    Plaintiffs and Plaintiffs' members have an interest in accurate information

3   about Defendant's discharges. Defendant's failure to accurately report and monitor

4   impedes Plaintiffs' abilities to carry out their missions, and Plaintiffs' members' ability to

5   fully use and enjoy the Receiving Waters for aesthetic, recreational, scientific,

6   educational, and spiritual purposes.

7       24.    Defendant's failure to comply with the procedural and substantive

8   requirements of the IGP and the CWA results in discharges of polluted storm water to the

9   Receiving Waters. Defendant's polluted discharges degrade water quality and harm

10  aquatic life in the Receiving Waters and thus impair Plaintiffs' and their members' use and

11  enjoyment of those waters.

12      25.    The violations of the IGP and CWA at the Facility are ongoing and

13  continuous. Thus, the interests of Plaintiffs and their members have been and will continue

14  to be adversely affected by Defendant's failure to comply with the IGP and the CWA.

15      26.    The relief sought herein will redress the harms to Plaintiffs and their members

16  caused by Defendant's activities. Continuing commission of the acts and omissions alleged

17  herein will irreparably harm Plaintiffs' members, for which they have no other plain,

18  speedy, or adequate remedy at law.

19      27.    An actual controversy exists as to the rights and other legal relations

20  between Defendant and Plaintiffs.

21  **IV.**    **LEGAL BACKGROUND**

22      **A.**    **The Clean Water Act.**

23      28.    The CWA requires point source discharges of pollutants to navigable waters

24  be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

25      29.    Section 301(a) of the Clean Water Act prohibits the discharge of any

26  pollutant into waters of the United States unless the discharge complies with the CWA.

27  Among other things, Section 301(a) prohibits discharges not authorized by, or in

28  violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA.

30.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

31.    "Waters of the United States" are defined as "navigable waters" and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

32.    The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *See* 40 C.F.R. § 122.2; 80 F.R. § 37054.

33.    The CWA confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water.

34.    The CWA requires all point source dischargers, including those discharging polluted storm water, achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. §125.3(a)(2)(ii)–(iii).

35.    Private citizens may sue under the Clean Water Act to enforce the specific provisions of California's Industrial General Permit. 33 U.S.C. § 1365(a)(1), (f)(6); *Russian River Watershed Prot. Comm. v. City of Santa Rosa,* 142 F.3d 1136, 1139 (9th Cir.1998).

**B.    California's IGP.**

36.    Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. It allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.

37.    California is a state authorized by the EPA to issue NPDES permits. In California, the State Board is charged with regulating pollutants to protect California's

water resources. Cal. Water Code § 13001.

38.    The IGP is a statewide general NPDES permit issued by the State Board pursuant to Section 402 that regulates the discharge of pollutants from industrial sites.

39.    Between 1997 and June 30, 2015, the IGP in effect was *Order No. 97-03-DWQ* ("1997 Permit"). On July 1, 2015, pursuant to *Order No. 2014-0057-DWQ* ("2015 Permit"), the reissued 2015 IGP took effect. The 2015 Permit supersedes the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit. On July 1, 2020, pursuant to *Order 2014-0057-DWQ as amended in 2015 and 2018* ("2020 Permit"), the reissued 2020 IGP took effect.

40.    In order to discharge storm water lawfully in California, certain industrial dischargers must secure coverage under the IGP and comply with its terms or obtain and comply with an individual NPDES permit. 2015 & 2020 Permits § I.A.12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the IGP by submitting a Notice of Intent to Comply with the IGP ("NOI") to the State Board. *Id*. § I.A.17.

41.    Industrial activities covered under the IGP are described in Attachment A of the Permit. Facilities with SIC code 3449 require coverage by the Permit. *Id*., Attachment A.

42.    Violations of the IGP are violations of the Clean Water Act. *Id*. § XXI.A.

**C.    The IGP Discharge Prohibitions.**

43.    The IGP contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this [Industrial] General Permit or another NPDES permit." *Id*. § III.A.

44.    The Discharge Prohibitions forbid the direct or indirect discharge of liquids or materials other than storm water ("non-storm water discharges" or "NSWDs"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *Id*. § III.B.

45.    These provisions further prohibit storm water discharges and authorized

non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. *Id*. § III.C.

46.    The IGP prohibits discharges that violate any discharge prohibitions contained in local Water Quality Control Plans ("Basin Plan") or statewide water quality control plans and policies. *Id*. § III.D.

47.    The San Diego Basin Plan prohibits "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives." Basin Plan at 4-20.

48.    Accordingly, where the discharge does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 Permits.

**D.    The IGP Effluent Limitations.**

49.    The IGP Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of BAT and BCT. 2015 & 2020 Permits § V.A.

50.    Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include chemical oxygen demand ("COD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, nitrate + nitrite nitrogen ("N+N"), iron, phosphorus, enterococcus, and fecal coliform, among others.

51.    Dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 2015 & 2020 Permits § V.A.

52.    EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). The 2015 MSGP went into effect on June 4, 2015, and the 2021 MSGP went into effect on March 1, 2021. The EPA Benchmarks

provide a relevant and objective standard to determine whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. *See* 2015 and 2021 MSGPs, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); 86 Fed. Reg. 10,269; *see also* 2015 MSGP Fact Sheet at 52; 2021 MSGP Fact Sheet at 78.

53.    Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009).

54.    Failure to develop or implement BMPs that constitute BAT and BCT is an IGP violation. 33 U.S.C. § 1311(b); 2015 & 2020 Permits § V.A.

**E.    The IGP Receiving Water Limitations.**

55.    The IGP Receiving Water Limitations prohibit storm water discharges and authorized non-storm water discharges from adversely impacting human health or the environment. 2015 & 2020 Permits § VI.B.

56.    Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the IGP's Receiving Water Limitations. *Id.*

57.    The IGP Receiving Water Limitations prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. *Id.* § VI.A.

58.    Water quality standards ("WQSs") consist of both "designated uses" for a body of water and a set of "criteria" specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses. 33 U.S.C. § 1313(c)(2)(A).

59.    WQSs applicable to dischargers covered by the IGP include, but are not limited to, those set out in the Basin Plan, and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38. Both the CTR and Basin Plan

WQSs must be attained at the point of discharge.

60.    The Basin Plan identifies designated "Beneficial Uses" for water bodies in the San Diego region under Clean Water Act Section 303. 40 C.F.R. § 131.

61.    The Beneficial Uses for the Spring Valley Creek and the Sweetwater River include municipal and domestic supply; industrial service supply; contact water recreation; non-contact recreation; warm-freshwater habitat; and wildlife habitat. Basin Plan, Table 2-2.

62.    The Beneficial Uses for the San Diego Bay include industrial service supply; navigation; contact water recreation; non-contact water recreation; commercial and sport fishing; wildlife habitat; preservation of biological habitats of special significance; marine habitat; estuarine habitat; migration of aquatic organisms; spawning, reproduction, and/or early development; shellfish harvesting; and rare, threatened, or endangered species. Basin Plan, Table 2-2.

63.    The Beneficial Uses for the Pacific Ocean include industrial service supply; navigation; contact and non-contact recreation; commercial and sports fishing; preservation of biological habitats of special significance; wildlife habitat; rare, threatened, or endangered species; marine habitat; aquaculture; migration of aquatic organisms; spawning, reproduction, and/or early development; and shellfish harvesting. Basin Plan, Table 2-3.

64.    Surface waters that cannot support their Beneficial Uses are designated "impaired" water bodies pursuant to Section 303(d) of the Clean Water Act.

65.    According to the current 303(d) List of Impaired Water Bodies, Sweetwater River is impaired for benthic community effects, bifenthrin, chlorpyrifos, indicator bacteria, nitrogen, dissolved oxygen, phosphorus, pyrethroids, total dissolved solids, and toxicity. The San Diego Bay is impaired for mercury, PAHs (polycyclic aromatic hydrocarbons), and PCBs (polychlorinated biphenyls). The Pacific Ocean shoreline near the San Diego Bay is impaired for indicator bacteria. California 2020-2022 Integrated Report.

66.    Polluted discharges from industrial facilities, such as the Facility, contribute to the degradation of these already-impaired surface waters, as well as aquatic-dependent wildlife.

67.    The following WQSs are established by the Basin Plan for the Spring Valley Creek downstream of the Facility: 0.3 mg/L for iron; 0.1 mg/L for phosphorus; 0.05 mg/L for manganese; and pH "shall not be depressed below 6.5 or raised above 8.5" in inland surface waters. Basin Plan at 3-21. The CTR criteria for copper is 0.013 mg/L based off 100 mg/L hardness; and the criteria for zinc is 0.12 mg/L based off 100 mg/L hardness.

68.    Because the IGP Receiving Water Limitation prohibits discharges that cause or contribute to an exceedance of any applicable WQSs, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the IGP. *See* 2015 & 2020 Permits § VI.A.

**F.    The IGP Storm Water Pollution Prevention Plan Requirements.**

69.    Prior to beginning industrial activities, dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). *Id*. §§ X.A–B.

70.    The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. *Id*. § X.

71.    The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs

to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan. *Id.* §§ X.A–I.

72.     Dischargers must evaluate their SWPPP at least annually and revise it as necessary to ensure compliance with the IGP. 2015 Permit §§ I.J.55, X.A.9, X.B.1; 2020 Permit §§ I.K.69, X.A.9, X.B.1. The IGP requires dischargers to certify and submit via the Storm Water Multiple Application & Report Tracking System ("SMARTS") database their SWPPP within 30 days whenever the SWPPP contains significant revisions. 2015 & 2020 Permits § X.B.2.

73.     The IGP requires dischargers to conduct an annual comprehensive site compliance evaluation that includes, *inter alia*, a review of all visual observation records, sampling and analysis results, and a review and evaluation of all BMPs. *Id.* § XV.

**G.     The IGP Monitoring and Reporting Requirements.**

74.     Permittees must develop and implement a monitoring implementation plan ("MIP"). *Id.* §§ X.I, XI. The MIP objectives are to ensure BMPs have been adequately developed, implemented, and revised, and confirm compliance with the IGP's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 2015 Permit §§ I.J.55–56, X.I, XI; 2020 Permit §§ X.I, X, I.K.69–70.

75.     The MIP thus aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43; 2020 Permit Fact Sheet § J at 138.

76.     Permittees must conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized non-storm

water discharges. 2015 & 2020 Permits § XI.A.1.

77.    A qualifying storm event ("QSE") is a precipitation event that produces a discharge for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area. *Id*. § XI.B.1.

78.    The Reporting Year is defined as July 1 through June 30. 2015 Permit § I.M.62.b; 2020 Permit § I.N.76.b. Permittees must collect and analyze storm water samples from two (2) QSEs within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30). *Id*. § XI.B.2.

79.    Permittees must submit all sampling and analytical results for all samples via the SMARTS database within thirty days of obtaining the results. *Id*. § XI.B.11.

80.    Permittees must analyze samples for TSS, O&G, and pH, at a minimum. *Id*. § XI.B.6.a–b.

81.    Permittees must analyze samples for other pollutants likely to be present in significant quantities in the storm water discharged from the facility that serve as indicators of the presence of all industrial pollutants. *Id*. § XI.B.6.c.

82.    Permittees must analyze storm water samples for all applicable parameters required by the Facility's SIC code, as set forth in Table 1 of the IGP. *Id*. § XI.B.6.d.

83.    Permittees must analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads. *Id*. § XI.B.6.e.

84.    Permittees must submit an annual report to the applicable Regional Board by July 15 of each year. The Annual Report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 and 2020 Permits, (2) an explanation for any non-compliance of requirements within the Reporting Year (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation.

85.    All reports, certifications, or other information required by the Permit or requested by a regional board are signed by an authorized facility and certified for accuracy. *Id*. § XXI.K.

## H.    The IGP Exceedance Response Action Requirements

86.    The 2015 and 2020 Permits incorporate a "multiple objective performance measurement system" utilizing Numeric Action Levels ("NALs") and Exceedance Response Actions ("ERAs"). 2015 Permit § I.M.61; 2020 Permit § I.N.75. The NALs/TNALs consist of annual and instantaneous numeric thresholds for various pollutants. An exceedance of a NAL/TNAL value for any given pollutant triggers an iterative process whereby the facility Owners and/or Operators must engage in specific ERAs as required by the 2015 and 2020 Permits.

87.    When the 2015 Permit became effective on July 1, 2015, all permittees were in "Baseline status" for all parameters listed in Table 2 of the Permit. 2015 & 2020 Permits § XII.B. A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. *Id*. § XII.C. Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred, and the discharger enters the ERA iterative process. *Id*. The ERA process requires the discharger to conduct an evaluation, with the assistance of a Qualified Industrial Storm Water Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s) by October 1 following commencement of Level 1 status. *Id*. §§ XII.C.1.a-b. The evaluation must include the identification of the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL/TNAL exceedances and to comply with the requirements of the General Permit. *Id*. § XII.C.1.c. Although the evaluation may focus on the drainage areas where the NAL/TNAL exceedance(s) occurred, all drainage areas shall be evaluated. *Id*.

88.    Based upon this Level 1 status evaluation, the permittee is required to prepare a Level 1 ERA Report no later than January 1 following commencement of Level

1 status. *Id*. § XII.C.2. The Level 1 ERA Report must be prepared by a QISP and include a summary of the Level 1 ERA evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded a NAL/TNAL. *Id*. §§ XII.C.2.a.i-ii. The SWPPP revisions and additional BMP development and implementation must also be completed by January 1, and the Level 1 status discharger is required to submit via SMARTS the Level 1 ERA Report certifying the evaluation has been conducted, and SWPPP revisions and BMP implementation have been completed. *Id*. A permittee's Level 1 status for a parameter will return to Baseline status if a Level 1 ERA report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL/TNALs exceedances for that parameter. *Id*. § XII.C.2.b. A permittee will enter a Level 2 status if there is a NAL exceedance of the same parameter when the discharger is in Level 1 status. *Id*. § D.

## V.     FACTUAL BACKGROUND

### A.     Facility Site Information, Industrial Activities, and Pollutant Sources.

89.    The SMARTS database indicates Defendant has been covered under the IGP since at least August 25, 2015 to conduct industrial operations at the Facility, under Waste Discharge Identification ("WDID") Number 9 37I026020.

90.    The Facility's Standard Industrial Classification ("SIC") code is 3449 (Miscellaneous Structural Metal Work), which requires Industrial General Permit coverage.

91.    According to the Facility's NOI, the Facility is one and one-half acres, and one acre is exposed to storm water. The Facility's SWPPP claims the Facility is two acres and is entirely paved, with approximately one-half acre of property where industrial activities are directly exposed to precipitation. SWPPP at 1.

92.    The Facility is a commercial steel fabrication company. *Id*. According to the SWPPP, this entails cutting sheet metal, operating handheld torches and saws, grinding, punching, and assembling shaped metal pieces by welding. *Id*. The SWPPP also

describes multiple uncovered storage areas for primed and galvanized materials throughout the Facility. *Id.*

93.     Direct observations, satellite imagery, and review of publicly available information including County of San Diego and Regional Water Quality Control Board ("Regional Board") inspection records evidence extensive outdoor activities including the storage of various raw and finished materials, loading and unloading of these materials, and the routine use of industrial equipment and vehicles, including but not limited to trucks and forklifts.

94.     The SWPPP acknowledges that potential pollutant sources associated with its industrial activities include motor oil, metal shavings, dust and particulate trackout, oil & grease, and residual material from dumpster and trash storage. *Id.* at 4-5. Notably, the SWPPP further acknowledges that galvanized or primed metal contained in the outdoor material storage areas is a potential source of zinc in storm water runoff. *Id.*

95.     Samples of the Facility's discharge obtained by CERF, at the Jamacha Road discharge location, and the Facility's own sampling data, establishes that the Facility discharges high concentrations of (1) metals such as copper, iron, manganese, zinc, and aluminum, (2) pH-affecting substances, and (3) nutrients such as phosphorus and nitrogen in excess of applicable water quality standards and EPA benchmarks promulgated to protect human health and the environment. Ex. 1, Facility's storm water sampling data.

96.     The U.S. EPA Industrial Stormwater Fact Sheet Series for the Fabricated Metal Products Manufacturing Facilities sector indicates that common pollutants associated with fabricated metal products manufacturing facilities include: steel scraps, aluminum scraps, brass, copper, dust, chips and borings, steel scale, Teflon, manganese, paint wastes, thinner, varnish, heavy metals, spent chlorinated solvents, aluminum, lead, zinc, copper, iron, oxide, oil, nickel, manganese, nickel, cadmium, chromium, and many others. *Available at*, https://www.epa.gov/sites/default/files/2015-10/documents/sector_aa_fabmetal.pdf.

97.    Storm water discharges from the Facility enter the County of San Diego storm sewer system ("MS4"), and thereafter flow into the Spring Valley Creek, the Sweetwater River, the San Diego Bay, and the Pacific Ocean.

98.    Industrial activities occur, and industrial materials are handled, at various locations throughout the Facility either outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and/or without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility.

99.    Many pollutants associated with industrial activities occurring at the Facility regularly escape via spills, dust emissions, wind dispersion, vehicle track out, or otherwise, resulting in pollutant dispersal throughout the Facility.

100.    Pollutants associated with the Facility's industrial activities have been and continue to be tracked by vehicles and dispersed via wind throughout the entire site, and on and off the Facility through ingress and egress. This results in trucks and vehicles tracking pollutants off-site, and aerial deposition of pollutants throughout the Facility as well as offsite.

101.    One or more regulated industrial activities are conducted at locations throughout the entire Facility, and thus the entire Facility requires IGP coverage.

102.    Even if regulated industrial activities are not conducted at all locations throughout the entire Facility, the Facility lacks BMPs or other controls that would adequately separate the storm water flows from portions of the Facility where non-regulated activities may occur from storm water flows from the regulated industrial activities.

103.    Due to both the Facility's lack of BMPs, and inadequacy of existing BMPs, storm water from areas of the Facility where industrial activities are conducted commingles with storm water from other areas of the Facility, and non-storm water commingles with storm water, and thus all discharges from the Facility are regulated under the IGP.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    18

104.    Industrial activities at the Facility generate significant amounts of numerous pollutants. During rain events, these pollutants are washed off surfaces throughout the Facility, discharged from the Facility, and eventually flow to Receiving Waters.

105.    While the Facility's site map fails to note the directions of storm water flow or delineate grade breaks and drainage areas, the designated storm water discharge locations suggest the Facility contains three separate drainage areas. *See* Ex. 1..

106.    One drainage area begins at the enclosed office building, where storm water flows south to Jamacha Road. A second drainage area around the back work area, where storm water flows north onto Birch Street. The third drainage area is parallel to the enclosed office building, where storm water flows west towards Sweetwater Lane. This is further supported by the site description in the Facility's Level 1 ERA report, which notes three drainage areas. According to the report, prepared by a Qualified Industrial Storm Water Practitioner ("QISP"), the Northern Drainage Area consists of industrial activities such as material storage and metal working; the Western Drainage Area consists of a non-industrial driveway area; and the Southern Drainage Area consists of shipping and receiving, metal working, and material storage. Level 1 ERA submitted on 12/17/2024 at 1.

**B.    The Facility Discharges Contaminated Storm Water in Violation of the IGP.**

107.    With every significant rain event, the Facility discharges polluted storm water into the Receiving Waters.

108.    The Receiving Waters into which the Defendant discharges polluted storm water are waters of the United States and therefore the IGP properly regulates discharges to those waters.

109.    Storm water and non-storm water discharges from the Facility violate the Discharge Prohibitions and Effluent Limitations of the IGP.

/././

/././

**1. Discharges of Polluted Storm Water from the Facility Violate IGP Discharge Prohibitions.**

110.    The Facility has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of IGP. *See* 2015 & 2020 Permits § III.C.

111.    The California Water Code defines "contamination" as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease."

112.    "Pollution" is defined as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses."

113.    The Facility's and CERF's sampling data show discharges with high concentrations of (1) metals such as copper, iron, manganese, zinc, and aluminum, (2) pH-affecting substances, and (3) nutrients such as phosphorus and nitrogen in excess of various water quality objectives, benchmarks, and other standards that were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters. Such discharges of polluted storm water violate the Permit. *See* Ex. 1. These polluted discharges cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Discharge Prohibition III.C.

114.    Defendant has violated and continues to violate Discharge Prohibition III.D of the Permit by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan, and other "statewide water quality control plans" such as the CTR. For example, CERF's monitoring data of the Facility's discharge on February 1, 2024 and January 26, 2025 shows numerous instances of high concentrations of (1) metals such as copper, iron, manganese, and zinc, (2) pH-affecting substances, and (3) nutrients such as phosphorus, in excess of respective Basin Plan Water Quality Objectives and the CTR. *See* Ex. 1, Sampling Data.

115.    Waste Discharge Prohibition number 5 of the San Diego Basin Plan states,

"the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited."

116.   "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water. California Water Code, § 13050(d).

117.   Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 IGP.

118.   Information available to Plaintiffs, including its review of publicly available information and observations, indicates that no express allowance for dilution has been granted to the Facility's discharges or to the downstream Receiving Waters.

119.   Thus, CERF's and the Facility's own monitoring data demonstrates the Facility has discharged and continues to discharge numerous pollutants in concentrations exceeding water quality objectives in violation of Discharge Prohibition III.D.

120.   Upon information and belief, including the likelihood of the presence of many additional pollutants described in Section V.A, supra, the Facility has discharged and continues to discharge numerous additional pollutants in concentrations exceeding water quality objectives in violation of Discharge Prohibition III.D.

121.   Each time the Facility discharges polluted storm water or non-storm water in violation of Sections III.C and III.D of the Discharge Prohibitions provisions of the IGP is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

122.   These Discharge Prohibition violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that prevent such discharges.

123.   The Facility has been in violation of these Discharge Prohibitions since at least April 2, 2020 and is subject to civil penalties for all violations of the Clean Water

1  Act occurring since that time. *See* Ex. 1. (setting forth dates of all precipitation events
2  during the past five years).

### 2.  Discharges of Polluted Storm Water from the Facility Violate IGP Effluent Limitations.

5  124.  Defendant has failed and continues to fail to develop and/or implement
6  BMPs as required to achieve compliance with the BAT/BCT standards to prevent the
7  discharge of polluted storm water from the Facility. *See* 2015 & 2020 Permits § V.A.

8  125.  CERF's and the Facility's own storm water monitoring data indicates that
9  the Facility's storm water discharges exceed the EPA Benchmarks for copper, zinc, and
10  aluminum on numerous occasions. *See* Ex. 1. For example, on February 1, 2024, the
11  Facility discharged concentrations of zinc at 1.6 mg/L, over thirteen times higher than the
12  EPA benchmark of 0.12 mg/L. *Id*. The January 26, 2025 samples show even higher
13  concentrations of zinc, 7 mg/L, 58 times higher than the EPA benchmark. *Id.*

14  126.  The January 26, 2025 samples also show concentrations of copper at 0.12
15  mg/L in the Facility's discharge, which is over twenty times higher than the EPA
16  benchmark of 0.0059 mg/L. *Id.*

17  127.  As discharges containing pollutant concentrations that exceed EPA
18  Benchmarks indicate the Facility has not developed and/or implemented BMPs that meet
19  BAT/BCT requirements, the sampling data collected strongly indicates the Facility has
20  failed and continues to fail to develop and/or implement BMPs that comply with the
21  BAT/BCT requirements.

22  128.  Further, visual observations and photographs of the Facility confirm that it
23  lacks BMPs that would achieve BAT/BCT. The SWPPP claims that the Facility covers
24  outdoor stored materials prior to rain. SWPPP at 7. However, as indicated in Exhibit 1,
25  PCI failed to cover industrial materials during rain events on February 1, 2024 and
26  January 26, 2025. Moreover, the Facility's own Level 1 ERA report also noted this as a
27  deficiency leading to polluted discharges during the 2023-2024 rainy season. Thus, the
28  Facility routinely fails to implement even the most basic BMPs indicated in its SWPPP,

like covering industrial materials, that would prevent pollutant exposure and runoff from industrial materials from entering the storm water discharge.

129.   Such poor housekeeping and ineffective implementation of supposed BMPs fail to constitute BAT/BCT and cast doubt regarding the efficacy of other BMPs identified in the SWPPP. Thus, the Defendant has failed to develop and implement BMPs that meet BAT/BCT requirements, in violation of the Industrial General Permit.

130.   Each time Defendant discharges polluted storm water in violation of Effluent Limitation V.A of the 2015 and 2020 Permits is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

131.   These effluent limitation violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

132.   The Facility has been in violation of these Effluent Limitations since at least April 2, 2020 and is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

## C.      Discharges of Polluted Storm Water from the Facility Violate IGP Receiving Water Limitations.

133.   The Facility has violated and continues to violate IGP Receiving Water Limitations.

134.   The Receiving Waters are impaired, and thus unable to support designated Beneficial Uses, for some of the same pollutants discharged by the Facility.

135.   Sweetwater River is impaired for phosphorus. Storm water samples collected from the Facility on February 1, 2024 show concentrations of phosphorus at 0.24 mg/L, over the Basin Plan objective of 0.1 mg/L. *See* Ex. 1. Because the Facility has never sampled for phosphorus itself, its discharge at levels above the Basin Plan has likely gone undetected for years. *See* Ex. 1.

136.   The Sweetwater River is impaired for low dissolved oxygen. Excess

concentrations of nutrients such as phosphorus and nitrogen can reduce levels of dissolved oxygen and cause hypoxia or harmful algal blooms that can create toxins. Such toxins can move up the food chain. U.S. EPA, *Nutrient Pollution, The Effects: Environment*, https://www.epa.gov/nutrientpollution/effects-environment (last updated Apr. 15, 2019). High phosphorus loading also results in reduced spawning grounds and nursery habitats, fish kills, and public health concerns related to impaired drinking water sources and increased exposure to toxic microbes. As such, the Facility's polluted discharges cause and/or contribute to Sweetwater River's dissolved oxygen, nitrogen, and phosphorus impairments. *See* Ex. 1.

137.    The Sweetwater River is impaired for toxicity. Zinc and copper are highly toxic pollutants in aquatic environments, and limitations on such toxic pollutants are specifically enumerated in the CTR. 40 C.F.R. § 131.38. The Facility's discharges of these toxic metals in excess of the CTR standards cause and/or contribute to the toxicity impairments of the Sweetwater River.

138.    The Sweetwater River is impaired for total dissolved solids ("TDS"). Dissolved solids in natural waters may consist of carbonates, bicarbonates, chlorides, sulfates, phosphates, nitrates, magnesium, sodium, iron, manganese and other substances." Basin Plan at 3-32. Therefore, the Facility's discharges of high concentrations of iron and manganese cause and/or contribute to the Sweetwater River's TDS impairment.

139.    The Basin Plan and CTR are applicable WQSs under the IGP.

140.    Therefore, the Facility's storm water discharges containing concentrations of pollutants in excess of applicable WQSs, which cause and/or contribute to respective impairments of Receiving Waters, violate the Receiving Water Limitations of the IGP. 2015 & 2020 Permits § VI.A.

141.    Discharges of elevated concentrations of pollutants in the Facility's storm water also adversely impact human health. These harmful discharges from the Facility are also violations of the IGP Receiving Water Limitations. *See* 2015 & 2020 Permits §

VI.B.

142.    Each time Defendant discharges polluted storm water in violation of the IGP's Receiving Water Limitations is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

143.    The Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the IGP's Receiving Water Limitations.

144.    The Facility has been in violation since April 2, 2020 and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

**D.      Defendant Has Violated and Continues to Violate IGP SWPPP Requirements.**

145.    Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP.

146.    Generally, the SWPPP lacks required sections and an adequate analysis of the industrial processes, associated pollutants, and BMPs. *See generally* 2015 and 2020 Permits § X.

147.    The SWPPP omits a list of industrial materials, including approximate quantities, physical characteristics, and storage locations. 2015 & 2020 Permits § X.G.2.

148.    Additionally, the SWPPP fails to contain a BMP Summary Table, which also violates the Permit. 2015 & 2020 Permits § X.H.5.

149.    The SWPPP's Pollution Prevention Team section fails to include the team members, positions within the Facility, or outline alternate procedures, in violation of the IGP. 2015 and 2020 Permits §§ X.D. This and other SWPPP deficiencies were noted by the QISP in the Facility's Level 1 ERA, but the SWPPP has yet to be updated and uploaded to SMARTS, an ongoing violation of the Permit. *See* Ex. 1.

150.    The SWPPP also fails to provide a comprehensive list of industrial processes and for the few processes mentioned, the SWPPP fails to contain the requisite narrative

description. For example, the SWPPP lists or alludes to the following processes: hazardous waste and scrap waste storage, material storage, fabrication, loading and unloading, and industrial machinery use, storage, and maintenance. SWPPP at 5, 8. However, the SWPPP fails to elaborate what exactly these activities entail, and where on site these activities occur. For industrial machinery and use, the SWPPP omits any of the required narrative. Thus, the SWPPP fails to provide all required elements describing its industrial processes, in violation of the Permit. 2015 & 2020 Permits § X.G.1.a.

151.    In light of the presence of particulates, the SWPPP must also conduct a dust and particulate analysis. 2015 & 2020 Permits § X.G.1.c. Specifically, the SWPPP should include discharge locations, the particulate source, and characteristics of the particulates. *Id.* However, the SWPPP omits any of this analysis, despite associating dust and particulates with four of its industrial activities. SWPPP at 5.

152.    The SWPPP correctly identifies Sweetwater River as a Receiving Water. However, the SWPPP fails to adequately analyze whether any potential pollutants would cause or contribute to the Sweetwater River's impairments. SWPPP at 6. Contrary to the SWPPP's claims, the Facility discharges into a water body on the 303(d) list, as the Sweetwater River is unfortunately impaired for numerous pollutants.

153.    Because the Facility fails to list all the industrial activities and associated pollutants, the SWPPP likewise fails to identify and implement BMPs to reduce exposure of pollutants associated with such activities. 2015 & 2020 Permits § X.H.  The SWPPP must (1) identify what BMPs are being implemented to prevent specific pollutant sources from entering storm water, (2) identify the pollutant this is intended to prevent (like metal particulates), (3) describe the frequency, location, and duration of these BMPs, (4) the individual responsible for implementation and procedures, (5) the equipment necessary, and (6) the visual observations' schedule in place to continue to monitor BMP effectiveness.

154.    The SWPPP fails to adequately (1) describe dust and particulate generating activities; and (2) to assess potential pollutant sources by, at a minimum, including (i) the

areas of the facility with likely source of pollutants in industrial storm water discharges and authorized NSWDs; (ii) the pollutants likely to be present in industrial storm water discharges and authorized NSWDs; (iii) the approximate quantity, physical characteristics (e.g., liquid, powder, solid, etc.), and locations of each industrial material handled, produced, stored, recycled, or disposed; (iv) the degree to which the pollutants associated with those materials may be exposed to, and mobilized by contact with, storm water; (v) the direct and indirect pathways by which pollutants may be exposed to storm water or authorized NSWDs; (vii) the effectiveness of existing BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs; and (viii) the estimated effectiveness of implementing, to the extent feasible, minimum BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs. 2015 & 2020 Permits, § X.G.1.c.

155.   The Facility site map is also defective, missing many components like storm water drainage areas, locations of structural controls, where materials are exposed to storm water, storage tanks, and shipping and receiving areas. 2015 & 2020 Permits § X.E.3. Indeed, the site map omits basic elements like a legend or north arrow. The Facility also admits that it discharges storm water in three locations; however, it does not list all three as sampling locations.

156.   The Facility Owners and/or Operators have also failed to revise the Facility's SWPPP to ensure compliance with the Industrial General Permit. Any significant revisions to the SWPPP must be maintained onsite and uploaded to SMARTS within thirty days of the revision. Despite the significant concentrations of pollutants in the Facility's storm water discharges, and the copious amounts of outdoor storage, information available to Coastkeeper and CERF indicates the Facility SWPPP has remained virtually the same since 2019 and has not been revised to include additional BMPs to eliminate or reduce pollutants in the Facility's storm water discharges, as required by the Permit.

157.   Every day the Facility operates with an inadequately developed and/or

1 implemented SWPPP, and/or with an improperly revised SWPPP is a separate and
2 distinct violation of the IGP and the Clean Water Act. Defendant has been in daily and
3 continuous violation of the IGP's SWPPP requirements since at least April 2, 2020.

4     158.    Therefore, PCI has also failed and continues to fail to develop and/or
5 implement a SWPPP that contains BMPs to adequately prevent the exposure of pollutants
6 to storm water and the subsequent discharge of pollutants from the Facility, in violation
7 of the Permit. CERF and Coastkeeper's direct observations, and publicly available
8 photos, strongly evidence that the Facility has failed, and continues to fail to implement
9 even minimum BMPs.

10     159.    These violations are ongoing and Defendant is subject to civil penalties for
11 all violations of the Clean Water Act occurring since that time.

12     **E.    Defendant Has Failed to Develop, Implement, and/or Revise an**
13     **Adequate Monitoring Implementation Plan at the Facility.**

14     160.    Defendant has conducted and continues to conduct operations at the Facility
15 with an inadequately developed, implemented, and/or revised MIP.

16     161.    The Facility Owners and/or Operators have failed and continue to fail to
17 develop and/or implement a MIP that provides for the collection of storm water samples
18 "from each drainage area at all discharge locations" at the Facility in violation of Permit.
19 2015 and 2020 Permits § XI.B.4. While Section XI.C.4 of the Permit allows permittees to
20 reduce the number of locations to be sampled, there is no indication the Facility Owners
21 and/or Operators have complied with the requirements of Section XI.C.4 to justify
22 sampling a reduced number of discharge locations at the Facility. The SWPPP's sampling
23 plan includes only two sampling locations. However, storm water is discharged at three
24 locations. Each place where storm water discharges from the Facility must be treated as a
25 separate discharge point requiring monitoring and testing.

26     162.    The Facility Owners and/or Operators have failed and continue to fail to
27 sample and analyze storm water discharges for all parameters required by the Permit.
28 CERF's storm water sampling found high concentrations of phosphorus, copper,

aluminum, and manganese. These pollutants stem from the Facility's many outdoor industrial activities. Facilities with the SIC code 34XX, like PCI, are required to sample for zinc, N+N, iron, and aluminum, in addition to the parameters required by all facilities (TSS, oil and grease, and pH). However, PCI's MIP does not require aluminum testing. Additionally, because the SWPPP and pollutant source assessment are deficient, there are numerous other pollutants associated with PCI's industrial activities and materials that PCI must include in its MIP. PCI's failure to include these parameters in the Facility's MIP is an ongoing violation of the Permit.

163.   The Facility Owners and/or Operators have also failed and continue to fail to collect the required number of storm water samples for each reporting period. The Permit requires facilities in a compliance group to collect two samples each reporting period. However, since at least 2019, the Facility has not collected the required number of storm water samples. *See* Ex. 1, Table 1. The Facility Owners and/or Operators' failure to collect the required number of storm water samples during each reporting period has violated and continues to violate the Permit.

164.   The Industrial General Permit requires dischargers to conduct visual observations of storm water discharges, of authorized and unauthorized NSWDs, and of BMPs. On information and belief, including the Facility's repeated violations of Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations, the Facility Owners and/or Operators fail to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

165.   Every day the Facility operates with an inadequately developed and/or implemented MIP, or with an improperly revised MIP is a separate and distinct violation of the IGP and the Clean Water Act.

166.   Defendant has been in daily and continuous violation of the IGP's MIP requirements since at least April 2, 2020.

167.   These violations are ongoing, and Defendant is subject to civil penalties for all violations of the IGP and Clean Water Act occurring since at least April 2, 2020.

**F.     Defendant Has Violated the IGP's Reporting Requirements.**

168.   Defendant has failed and continues to fail to submit Annual Reports that comply with the IGP reporting requirements.

169.   In each Annual Report, the Facility Owner and/or Operator certifies that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the IGP; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the IGP, or will otherwise be revised to achieve compliance. "Clean Water Act section 309(c)(4) provides that any person that knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under this Industrial General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than two years or by both." 2015 & 2020 Permits § XXI.N.

170.   The Facility Owners and/or Operators have submitted multiple Annual Reports which were certified attesting to the Facility's compliance with the terms of the Permit. However, information available to Coastkeeper and CERF indicates that these certifications are erroneous. As discussed, the Facility has violated, and continues to violate, numerous provisions of the Permit. The Facility's Legally Responsible Person (LRP) knew or should have known the Facility failed to comply with numerous procedural and substantive provisions of the Permit, and thus certifications of the Facility's Annual Reports were erroneous.

171.   Every day Defendant conducts operations at the Facility without reporting as required by the IGP is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

172.   Defendant has been in daily and continuous violation of the IGP's reporting requirements every day since at least April 2, 2020.

173.   These violations are ongoing, and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since April 2, 2020.

**G.      Defendant Has Violated the IGP's Exceedance Response Action Requirements**

174.    The Facility Owners and/or Operators have failed to comply with several of the Industrial General Permit's ERA requirements.

175.    The Facility's storm water monitoring data for the 2023-2024 reporting period shows the Facility exceeded the annual average NAL for iron and zinc. The Facility's Level 1 ERA Technical Report indicated the need to increase housekeeping frequency. Nonetheless, the Facility failed to upload a new SWPPP reflecting the new frequency. In addition, CERF's site visit on January 26, 2025 indicates the Level 1 ERA is not being implemented due to material storage outdoors without adequate cover. Moreover, the Facility continues to high levels of iron and zinc, demonstrating that the Level 1 Technical Report is deficient.

176.    The Facility Owners and/or Operators have failed and continue to fail to conduct adequate Level 1 status evaluations and prepare reports that comply with the Industrial General Permit.

177.    As such, the Facility Owners and/or Operators are in daily violation of the Industrial General Permit. Every day the Facility Owners and/or Operators conduct operations at the Facility without an adequate SWPPP update is a separate and distinct violation of the Industrial General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

178.    The Facility Owners and/or Operators have been in daily and continuous violation of the Industrial General Permit's Level 1 status ERA SWPPP revision requirement every day since at least January 1, 2024. These violations are ongoing, and Coastkeeper and CERF will include additional violations when information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act and Industrial General Permit's requirements.

/./.

/./.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP's Discharge Prohibitions and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

179.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

180.   Defendant has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Section III.C of the IGP.

181.   Defendant has discharged and continues to discharge numerous pollutants in excess of water quality objectives listed in the Basin Plan in violation of Section III.D of the IGP.

182.   Defendant has been in violation of the IGP Discharge Prohibitions at the Facility every day from at least April 2, 2020 to the present. Defendant's violations of the IGP Discharge Prohibitions are ongoing and continuous.

183.   Each and every violation of the IGP Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from April 2, 2020 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

### SECOND CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP's Effluent Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

184.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

185.   Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs

1    that achieve BAT/BCT at the Facility.

2         186.   Discharges of storm water containing levels of pollutants that do not achieve

3    compliance with BAT/BCT standards occur every time storm water discharges from the

4    Facility.

5         187.   Defendant's failure to develop and/or implement BMPs that achieve the

6    pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of

7    the IGP and the CWA. *See* 2015 & 2020 Permits § V.A; *see also* 33 U.S.C. § 1311(b).

8         188.   Defendant violated and continues to violate the IGP Effluent Limitations

9    each time storm water containing levels of pollutants that do not achieve BAT/BCT

10   standards discharge from the Facility.

11        189.   Defendant has been in violation of the IGP Effluent Limitations at the

12   Facility every day from at least April 2, 2020 to the present. Defendant's violations of the

13   IGP Effluent Limitations and the CWA are ongoing and continuous. Defendant will

14   continue to be in violation of the IGP and the CWA each day it fails to adequately

15   develop and/or implement BMPs to achieve BAT/BCT at the Facility.

16        190.   Each day that Defendant operates the Facility without adequately developing

17   and/or implementing BMPs that achieve BAT/BCT in violation of the IGP is a separate

18   and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

19        191.   Each day that Defendant operates the Facility without adequately developing

20   and/or implementing BMPs that comply with Effluent Limitations in violation of the IGP

21   is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

22   By committing the acts and omissions alleged above, Defendant is subject to civil

23   penalties for each and every violation of the CWA occurring since April 2, 2020. 33

24   U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

25                          **THIRD CAUSE OF ACTION**

26     **Discharges of Contaminated Storm Water in Violation of IGP Receiving**
                 **Water Limitations and the Clean Water Act.**

27             **33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

28        192.   Plaintiffs incorporate the allegations contained in the above paragraphs as

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES    33

though fully set forth herein.

193.    The Facility discharges storm water containing levels of pollutants that adversely impact human health and/or the environment.

194.    Defendant discharges storm water containing levels of pollutants that cause or contribute to exceedances of WQSs from the Facility.

195.    Discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

196.    Discharges of storm water containing levels of pollutants that cause or contribute to exceedances of WQSs occur each time storm water discharges from the Facility.

197.    Defendant's discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, are violations of the IGP and the Clean Water Act. 2015 & 2020 Permits §§ VI.A–B; 33 U.S.C. § 1311(b).

198.    Defendant violated and will continue to violate the IGP Receiving Water Limitations every time storm water containing levels of pollutants that adversely impact human health or the environment, or that cause or contribute to exceedances of WQSs discharge from the Facility.

199.    Defendant has been in violation of the IGP Receiving Water Limitations at the Facility every day from April 2, 2020 to the present. Defendant's violations of the IGP Receiving Water Limitations and the CWA are ongoing and continuous.

200.    Defendant will continue to be in violation of the IGP and the CWA each time storm water containing levels of pollutants that adversely impact human health or the environment, or that causes or contributes to exceedances of WQSs is discharged from the Facility.

201.    Each day that Defendant has discharged and/or continues to discharge polluted storm water from the Facility in violation of the IGP is a separate and distinct

violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

202.   Defendant has been in violation of the IGP Receiving Water Limitations every day since April 2, 2020. By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA since April 2, 2020. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

<u>**FOURTH CAUSE OF ACTION**</u>

**Failure to Adequately Develop, Implement, and/or Revise the Facility's Storm Water Pollution Prevention Plans in Violation of the IGP and the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

203.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

204.   Defendant has failed and continues to fail to develop and/or implement an adequate SWPPP for the Facility.

205.   Defendant has failed and continues to fail to adequately revise the SWPPP for the Facility.

206.   Defendant conducts operations at the Facility each day without an adequately developed, implemented, and/or revised SWPPP. Defendant's failure to adequately develop, implement, and/or revise SWPPPs for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § X; *see also* 33 U.S.C. § 1311(b).

207.   Defendant has been in violation of the IGP SWPPP requirements at the Facility every day from at least April 2, 2020, to the present. Defendant's violations of the IGP SWPPP requirements and the CWA at the Facility are ongoing and continuous.

208.   Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop, implement, and revise the Facility SWPPP.

209.   Each day Defendant operates the Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a). By committing the acts and omissions alleged above,

Defendant is subject to civil penalties for each and every violation of the CWA occurring since April 2, 2020. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## FIFTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and Revise Adequate Monitoring Implementation Plan in Violation of the IGP and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

210.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

211.    Defendant has failed and continues to fail to develop and/or implement an adequate MIP for the Facility. Defendant operates the Facility each day without an adequately developed, implemented, and/or revised MIP.

212.    Defendant's failure to adequately develop, implement, and/or revise the MIP for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § XI; *see also* 33 U.S.C. § 1311(b).

213.    Defendant has been in violation of the IGP MIP requirements every day from at least April 2, 2020, to the present. Defendant's violations of the IGP MIP requirements and the CWA at the Facility are ongoing and continuous.

214.    Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to adequately develop, implement, and/or revise the Facility MIP.

215.    Each day that Defendant operates the Facility without developing, implementing, and/or revising an adequate MIP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since April 2, 2020. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SIXTH CAUSE OF ACTION

**Failure to Properly Monitor in Violation of the IGP.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

216.    Plaintiffs incorporate the allegations contained in the above paragraphs as

though fully set forth herein.

217.    Defendant has failed and continues to fail to conduct the requisite visual observations of storm water discharges at the Facility in violation of the IGP and the CWA. *See* 2015 & 2020 Permits § XI.A; *see also* 33 U.S.C. § 1311(b).

218.    Defendant has failed and continues to fail to collect and analyze the required number of storm water samples at the Facility in violation of the IGP and the CWA. 2015 Permit & 2020 Permits §§ XI.B.1–3; 33 U.S.C. § 1311(b).

219.    Defendant has failed and continues to fail to analyze all collected samples for all required parameters in violation of the IGP and the CWA. *See* 2015 & 2020 Permits § XI.B.6; *see also* 33 U.S.C. § 1311(b).

220.    Defendant has failed and continues to fail to comply with the IGP's monitoring requirements at the Facility since at least April 2, 2020. Defendant's violations of the IGP monitoring requirements and the Clean Water Act are ongoing and continuous.

221.    Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP's monitoring requirements.

222.    Each and every violation of the IGP's monitoring requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since April 2, 2020. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SEVENTH CAUSE OF ACTION

**Failure to Comply with ERA Requirements in Violation of the IGP and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

223.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

224.    Defendant has failed and continues to fail to implement its Level 1 ERA

Report as evidenced by the ongoing contamination exceedances. 2015 & 2020 Permits § XII.C.2.

225.    Defendant has failed and continues to fail to update its SWPPP to reflect its Level 1 ERA Report. 2015 & 2020 Permits § XII.C.

226.    Defendant's failure to comply with the IGP ERA requirements is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § XII.C.2; *see also* 33 U.S.C. § 1311(b).

227.    Defendant conducts operations at the Facility each day without following ERA requirements. Defendant has been in violation of the IGP's Level 1 status ERA SWPPP revision requirement every day since at least January 1, 2024. Defendant's violations of the ERA requirements of the IGP and the CWA are ongoing and continuous.

228.    Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP ERA requirements at the Facility.

229.    Each and every violation of the IGP ERA reporting requirement is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since January 1, 2024. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## VII.    **RELIEF REQUESTED**

230.    Plaintiffs respectfully request that this Court grant the following relief:

a.    A court order declaring the Defendant has violated and continues to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to comply with discharge prohibitions, effluent limitations which include BAT/BCT requirements, and for failing to comply with the other substantive and procedural requirements of the IGP as set forth within this Complaint;

b.    A court order enjoining Defendant from discharging pollutants from the

1    Facility to surface waters in violation of the Clean Water Act and IGP;

2         c.    A court order requiring Defendant to implement affirmative injunctive

3    measures designed to eliminate Defendant's violations of the substantive and procedural

4    requirements of the IGP and the Clean Water Act;

5         d.    A court order assessing civil monetary penalties for each violation of the

6    CWA at $68,445 per day per violation for violations that occurred after November 2,

7    2015 and assessed on or after January 8, 2025; 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4.

8         e.    A court order awarding Plaintiffs their reasonable costs of suit, including

9    attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean

10   Water Act, 33 U.S.C. § 1365(d)

11        f.    Any other relief as this Court may deem appropriate.

12

13   Dated: July 10, 2025

14                                         Respectfully submitted,

15                                         COAST LAW GROUP LLP
                                           By: s/Livia B. Beaudin
16                                         LIVIA B. BEAUDIN
17                                         Attorney for Plaintiffs
                                           COASTAL ENVIRONMENTAL
18                                         RIGHTS FOUNDATION
19                                         E-mail: livia@coastlawgroup.com

20

21                                         SAN DIEGO COASTKEEPER
                                           By: s/Patrick McDonough
22                                         PATRICK MCDONOUGH
23                                         Attorney for Plaintiffs
                                           SAN DIEGO COASTKEEPER
24                                         E-mail: patrick@sdcoastkeeper.org

25

26

27

28